UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

NANCY RICE )
)
V. ) NO. 2:13-CV-204
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Her applications for disability insurance benefits and supplemental security income under the Social Security Act were denied following a hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed Motions for Summary Judgment [Docs. 14 and 18].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues

differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 49 years of age, a "younger" individual, at the time of the ALJ's negative decision. She has a limited education. There is no dispute that she cannot return to any of her past relevant work. Her alleged disability onset date is December 1, 2008, and she has not engaged in substantial gainful activity since that date.

Plaintiff's medical history is summarized in the plaintiff's brief as follows:

> Plaintiff was seen at Dr. Aubrey McElroy's office on September 5, 2008 to establish with a new doctor (Tr. 366). Following this initial visit and physical examination, Dr. McElroy gave diagnoses of tobacco use, DJD, Sciatica, abnormal weight gain, chronic fatigue syndrome, and low back pain (Tr. 367-368). Plaintiff followed up with this doctor on October 2, 2008 and the previous diagnoses remained the same (Tr. 370-371). On October 29, 2008, Plaintiff reported "significant lower back pain of 3 days duration (Tr. 374). The pain was described by Plaintiff as being a dull and aching pain with intermittent sharp component with movement, radiation into the legs, worse with bending, marked discomfort on walking, and the inability to sit for long periods of time without discomfort (Tr. 374). On examination, edema was noted along with tenderness in the SI region and right trochanteric area (Tr. 374). Following this visit, a new diagnosis of edema was given (Tr. 375). Plaintiff returned to this doctor again on November 25, 2008 with the same allegations of pain, but also with reported blood sugar elevation to 500(+) (Tr. 377). Diabetes uncomplicated type II was added to Plaintiff list of diagnoses (Tr. 378). Plaintiff continued with approximately monthly visits at this location (Tr. 378-398). On April 27, 2009, Plaintiff returned and reported continuing edema which worsens as the day goes on, especially when she is on her feet (Tr. 398). On physical examination, Plaintiff's right trochanteric bursa (hip area) was found to be very tender; the edema was noted bilaterally in the mid calf, along with continued tenderness in the SI region (Tr. 398). The doctor gave Plaintiff an injection for the trochanteric bursa and added the diagnosis of bursitis (Tr. 399). Plaintiff was instructed to apply ice and heat intermittently / as instructed to affected areas (Tr. 405).
> Plaintiff was treated at Virginia Correctional Center from June 29, 2009 through June

1, 2010 (Tr. 202-303). On June 29, 2009, Plaintiff's conditions were noted to include hypertension, diabetes, asthma, COPD, ulcers, and back problems (Tr. 302). On July 1, 2009, Plaintiff was noted to have sciatica and required the "bottom bunk" for six months (Tr. 301). Plaintiff was noted to have tested positive for Hepatitis C on July 9, 2009 (Tr. 300). Shaky, dizziness, and hand tremors were reported on July 20, 2009 (Tr. 300). Dizziness was again reported on July 21, 2009, July 27, 2009, August 6, 2009 and August 17, 2009 (Tr. 296-299). Edema in hands and lower extremities was noted on August 26, 2009 (Tr. 289).

On June 8, 2010, Plaintiff returned to Dr. Aubrey McElroy to re-establish treatment (Tr. 407). Plaintiff continued to report back and leg pain with worsening symptoms with walking and bending (Tr. 407). Plaintiff also reported having lots of spasms (Tr. 407). On physical examination, Plaintiff was noted as having tenderness in the right trochanteric bursa, edema bilaterally in the mid calf, and continuing tenderness in the back (Tr. 407). During this visit, Plaintiff also reported anxiety symptoms and was started on the medication Xanax (Tr. 408). Following this visit, Dr. McElroy completed a Request for Medical Information form from the Department of Human Services (Tr. 305). On behalf of Plaintiff, the doctor indicated "This person is physically or mentally unfit for employment or training for employment, in your medical opinion" and "This person will be unable to work or work or participate in training for 2 yrs" (Tr. 305).

Plaintiff returned to Dr. McElroy on October 5, 2010 (Tr. 417). Plaintiff continued to report hip and back pain along with anxiety. Plaintiff was administered injections for the pain (Tr. 418). Plaintiff's diagnoses included Panic Disorder, Piriformis Syndrome, Trochanteric Bursitis, Diabetes, DJD, Sciatica, Chronic Fatigue Syndrome and Low Back Pain (Tr. 419). Plaintiff returned to this doctor on December 2, 2010 and March 2, 2011 with physical examination findings remaining consistent with tenderness and swelling (Tr. 420, 423).

At the request of the Disability Determination Service (DDS), Plaintiff was evaluated on November 18, 2010 by a psychological examiner, Anna Palmer, MS, SPE (Tr. 307-310). This examination involved a clinical interview with a mental status examination. This evaluation and report were broken down into twelves sections. These sections included: Identifying Information and General Observations; Personal and Family History; Academic and Vocational History; Medical History; Mental Health History; Mental Status; Current Signs and Symptoms; Activities of Daily Living; Ability to Relate; Mental Capability; Assessment of Ability to Perform Work-related Activities; and Diagnostic Impression (Tr. 307-310). Allegations of disability were noted to include back and nerve damage, diabetes, high blood pressure, depression, bipolar, COPD, Hepatitis C, glaucoma, GERD, pain, and anxiety (Tr. 307). The Mental Status portion of the exam indicated Plaintiff's hygiene and grooming appeared within normal limits; no psychomotor abnormalities; Plaintiff was not seen as exaggerating her symptoms for the purpose of gaining disability benefits; affect was noted as anxious and fidgety; concentration was noted as being limited; and intelligence was thought to be in the low average range (Tr. 308-309). Based on the overall evaluation of Plaintiff, the examiner rendered concluding opinions in the Assessment of Ability to Perform Work-related Activities and the Diagnostic Impression (Tr. 310). Among the limitations opined to by the examiner was a moderately to markedly limitation in concentration and persistence with the follow-up notation that this would make Plaintiff's ability to meet the demands

3

of work-related decisions inconsistent (Tr. 310). The examiner also stated "Her physical problems may detract from her ability to maintain attendance and meet an employment schedule" (Tr. 310). The diagnostic impression included Major Depressive Disorder, Recurrent, Moderate and Anxiety Disorder NOS was given (Tr. 310).

On November 24, 2010, again at the request of DDS, Plaintiff was evaluated by Marianne Filka (Tr. 311-317). This report included thirteen sections and subsections, including: History; Past Medical Illnesses; Current Medications; Past Surgeries; Allergies; Social History; Family History; Review of Systems; Medical Records Review; Physical Examination; Mental Status; Diagnoses; and Medical Assessment (Tr. 311-316). In the Review of Systems section, positives were noted for night sweats, memory loss, migraines, changes in eyesight, eye pain, hearing difficulty, trouble breathing, shortness of breath, stomach ulcers, hot flashes, joint pain, back pain, numbness, tingling, weakness, difficulty walking and gripping, joint swelling, painful muscles, bleeding easily, being tired, being sluggish, having anxiety, crying easily, and loss of interest in usual activities. Concluding the evaluation report, the examiner opined to diagnoses including: chronic constant lumbar back pain with intermittent radiating of pain down both legs; glaucoma; diabetes; history of hepatitis C; history of COPD; obesity; anxiety; osteoarthritis; history of migraine headaches; history of hearing difficulty; and edentulous (Tr. 315-316). The examiner also administered a breathing test on Plaintiff (Tr. 318-329). This report indicated normal to mild restrictions (Tr. 318, 324, 326). The examiner's overall medical assessment rendered the opinion of Plaintiff being capable of lifting, pushing, or pulling up to 30 pounds occasionally and 20 pounds more frequently (Tr. 316). The examiner further opined to Plaintiff not operating heavy vibrating equipment (Tr. 316).

On December 6, 2010, Karen Lawrence, Ph.D. reviewed Plaintiff's information and rendered an overall opinion for DDS (Tr. 330-347). This reviewing source completed a Psychiatric Review Technique and a Mental RFC Assessment. Plaintiff's conditions were noted as being reviewed under 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders (Tr. 330, 344). Plaintiff was opined as having a marked limitation in the ability to interact appropriately with the general public (Tr. 345). The remaining functional areas were noted as being no more than moderately limited (Tr. 340, 344-345).

On March 1, 2011, Dr. Calvin Miller from Johnson City Eye Clinic evaluated Plaintiff at the request of the DDS (Tr. 351-355). Following visual testing, the doctor opined to Plaintiff having very mild visual restriction and very slight and clinically insignificant cataracts (Tr. 351).

Plaintiff returned to Dr. McElroy's office on June 1, 2011 (Tr. 426). Complaints during this visit included anxiety, hip pain, and sciatic pain (Tr. 426). The hip pain was reported to be worse at night, radiating down to the right knee, and worse with stormy weather, sitting, standing, first thing in the morning, and bending (Tr. 426). The hip pain was noted as improving with vibrating heat, meds, and sitting the proper way. The sciatic pain was reported to run down the right leg and worse with standing and bending (Tr. 426). Therapy instruction included back and neck exercises, ice pack, and heat pack (Tr. 426).

On January 13, 2012, Dr. McElroy wrote a letter on behalf of Plaintiff (Tr. 432). In this letter the doctor indicated that he has treated Plaintiff since September 5, 2008 (Tr.

4

432). The doctor further reported Plaintiff's conditions as including chronic back pain, sciatica, chronic fatigue syndrome, sacroiliac syndrome, and poorly controlled diabetes type II. The doctor states "Not one of these problems disables her completely, but the sum total of these problems makes it very hard for her to work regularly without significant pain" (Tr. 432). The doctor reports that it is very painful for Plaintiff to sit for more than an hour due to the sciatica and sacroiliac syndrome. Further, the chronic low back pain and chronic fatigue syndrome make it painful for Plaintiff to stand very long (Tr. 432). Dr. McElroy concludes the letter by stating "Without insurance it has been very hard to get the needed MRIs and Cts to find the full cause of her Chronic back pain" (Tr. 432).

[Doc. 15, pgs. 2-7].

Plaintiff's synopsis of the medical evidence does not include the evaluation by State Agency physician Dr. James B. Millis. After reviewing the evidence, including available x-rays of plaintiff's hips and pelvis from the plaintiff's prison records, and the examination of Dr. Filka, Dr. Mills opined that the plaintiff could perform the full range of light work, except for a need to avoid concentrated exposure to vibrations. (Tr. 356-364).

At the plaintiff's administrative hearing, the ALJ took the testimony of Dr. Robert Spangler, a vocational expert ["VE"]. He asked Dr. Spangler to assume a person "restricted to light work with no climbing of ladders, ropes, and scaffolds; no more than occasional climbing of ramps and stairs; stooping, kneeling, crouching or crawling; ... can't have any concentrated exposure to pulmonary irritants or vibration; mentally...she is able to perform and maintain concentration for simple, routine, repetitive tasks; adapt to gradual and infrequent changes in a work setting; and...she is limited to work that does not require public interaction or more than occasional interaction with coworkers and supervisors...." When asked if there were jobs such a person could perform, Dr. Spangler responded "at light, simple, routine, repetitive with being able to adapt to gradual changes only [if] she could do the full range [of light work] which she could not; there's 129,460 in the nation, there's 2,741

5

in the state of Tennessee, give or take. And with the other limitations I'd reduce that by 40 percent, so 60 percent would be the residual unless other things were added." Dr. Spangler said these jobs were "food prep," "non-farm animal care," and "dining room helper." Plaintiff's counsel, referring to the food service jobs, asked if the "hypothetical individual also had hepatitis, would that have an impact as far as whether or not you would want to typically place that person in those settings?" Dr. Spangler replied "I wouldn't." (Tr. 56-58).

Thus, if the plaintiff could do all three of the jobs Dr. Spangler identified initially, there are 77,676 jobs in the national economy and 1,645 jobs in the State of Tennessee which the plaintiff can perform. If the food industry jobs were taken out of the equation, the number is uncertain, limited to the job of "non-farm animal care."

In his decision, the ALJ found that the plaintiff had severe impairments of degenerative joint disease, obesity, major-depressive disorder; and anxiety. He found that she did not have severe impairments with respect to her diabetes, decreased vision, chronic obstructive pulmonary disease, or hepatitis C. Before proceeding with the analysis, the Court notes that Hepatitis C, unlike other forms of hepatitis, "is not spread by sharing eating utensils, breast feeding, hugging, kissing, holding hands, coughing or sneezing. It is also not spread through food or water." Also, "there is no evidence that people can get Hepatitis C from food handlers,..." *See,* United States Centers for Disease Control, *Hepatitis C FAQs for the Public, [www.cdc.gov/hepatitis/c/cfaq.htm#cFAQ81.](www.cdc.gov/hepatitis/c/cfaq.htm#cFAQ81.)* Thus, Hepatitis C is logically ***not*** an impediment to obtaining a job in the food service industry. Plaintiff's question to the VE described above referred to "hepatitis" in a generic fashion. Therefore the Court assumes that the VE was referring to the more virulent forms of hepatitis which can be spread by food

6

Case 2:13-cv-00204-JRG-DHI   Document 20   Filed 08/11/14   Page 6 of 11   PageID #: 523

preparers or handlers.

The ALJ found the plaintiff had a moderate restriction in activities of daily living, marked difficulties in social functioning, and moderate difficulties in concentration, persistence or pace. (Tr. 22). Therefore, he found that she did not meet any mental listing. (Tr. 23).

The ALJ then found that the plaintiff had the residual functional capacity ["RFC"] contained in his hypothetical question to Dr. Spangler, the VE, set out above. (Tr. 23). He then found that the plaintiff was not credible to the extent she claimed to be more limited than his RFC finding. In this regard, he based that finding on her daily activities, noting "[d]espite these allegations, the claimant attends to her personal care needs, prepares meals, dusts and watches television. Additional, she reported...that she occasionally shops, visits family, and goes to church. The claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Further, Anna Palmer, M.S., a consultative examiner, noted that the claimant demonstrates independence in her activities of daily living." (Tr. 24).

He also based his credibility determination on the medical evidence, which he thoroughly described. (Tr. 25-26). He then discussed the medical and psychological opinions. He found the State Agency personnel "adequately considered the evidence of record" and gave "great weight...to the opinions." He also gave great weight to Dr. Filka, who examined the plaintiff. He also gave some weight to the psychologist Dr. Palmer, except he found her opinion that plaintiff had a moderate to marked impairment in concentration persistence or pace to be unsupported, inconsistent with other mental evidence,

7

and inconsistent with plaintiff's "benign clinical presentations, conservative treatment, and objective tests and scans." (Tr. 26-27).

He gave little weight to Dr. McElroy, the plaintiff's treating doctor, particularly the letter from Dr. McElroy dated January 13, 2012. (Tr. 432). Dr. McElroy's opinion was that the combination of the plaintiff's many impairments of "chronic low back pain of undetermined source, sciatica, chronic fatigue syndrome, sacroiliac syndrome and poorly controlled diabetes...makes it very hard for her to work regularly without significant pain" or to sit for more than an hour or stand for very long. The ALJ noted that Dr. McElroy stated that the plaintiff "needs a full evaluation for her physical disability based on her overall condition." In giving Dr. McElroy little weight, he noted that the doctor felt that plaintiff needed a full disability evaluation, and that the noted limitations were "not well supported by medically acceptable clinical findings...inconsistent with other substantial medical evidence of record," and "is inconsistent with the claimant's benign clinical presentations, conservative treatment, and objective tests and scans." (Tr. 27).

The ALJ went on to find that the plaintiff was unable to return to her past work. Based upon the VE testimony, he found that plaintiff could perform 129,460 in the national economy and 2,741 jobs in the state, reduced by 40%, leaving 77,676 national jobs and 1,645 in the state. The ALJ found that these were a significant number of jobs. Accordingly, he found that the plaintiff was not disabled. (Tr. 28).

The plaintiff's first objection to the ALJ's decision is that he erred in the weight given to treating physician McElroy. Also, the plaintiff accuses the ALJ of only considering that portion of the opinion where the doctor suggested the plaintiff needed a full disability

8

evaluation. Naturally, treating physicians are to be accorded great weight if supported by the medical record, and controlling weight if uncontradicted. However here there was medical evidence to contradict Dr. McElroy's limitations on the plaintiff's ability to sit and stand, both from Dr. Filka's consultative exam, the evaluation by State Agency physician Mills, and in Dr. McElroy's own records. Dr. McElroy found that while plaintiff complained of tenderness in her back, there was no loss of coordination, weakness or loss of motor strength (Tr. 366). He gait was normal (Tr. 367). Dr. McElroy also frequently advised plaintiff to exercise daily.

Although the plaintiff complains that the ALJ did not consider all of Dr. McElroy's opinion because he only mentioned the statement about the need for a full disability exam, this Court believes that the ALJ did consider all of Dr. McElroy's records and his opinions. It is also to Dr. McElroy's credit that he stated a disability exam should be done. That is precisely what Dr. Filka did, and the ALJ gave that opinion great weight.

Plaintiff also asserts that the plaintiff did not have the means to obtain tests and scans. However, there were many records available to the State Agency physician from the time that plaintiff was an inmate at the Virginia Correctional Center for Women, and Dr. Millis discusses those in his medical assessment. (Tr. 363). Also, Dr. Filka was aware of radiological testing. (Tr. 311).

The plaintiff also complains that the ALJ did not address the June 8, 2010 form in which Dr. McElroy to the effect that plaintiff would not be physically or mentally fit for work for 2 years. Although the ALJ did not specifically mention that opinion, Dr. McElroy's feeling in that regard is certainly included in the opinion letter discussed above.

9

Under the facts of this case, the Court finds that there were adequate reasons for the ALJ not giving great weight to the opinions of Dr. McElroy.

The plaintiff also asserts that the ALJ did not discuss the opinion of the VE that he would not place a person with hepatitis in a food service position. This has been discussed above, and the plaintiff's form of hepatitis cannot be spread by a food handler doing his or her job. Also, the ALJ found that plaintiff's hepatitis C was not a severe impairment. Considering the nature of that impairment, the Court agrees.

The final issue is the small number of jobs which the VE identified that a person with the plaintiff's RFC as found by the ALJ could perform. Regarding the number of jobs in the national economy, the Court does not recall a lower number than the 77,676 identified by Dr. Spangler in any case that has come before this Magistrate Judge. The Court does recall a few cases in which the number of regional jobs was less than the 1,645 identified here. What constitutes a significant number of jobs is always problematic, and this case more so than most.

There is no "special number which is to be the boundary between a 'significant number' and an insignificant number of jobs." *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). Like all other findings of an ALJ, it must be supported by substantial evidence. In *Hall* itself, 1,350 jobs in the local region was found to be a significant number. The *Hall* court stated that the fact finder "should consider many criteria... and went on to suggest a noninclusive list. *Id.* It stated that "the decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Id.* The *Hall* court reversed the finding of the district court that 1,350 jobs was

not a significant number, stating that the "finding of the ALJ...is supported by substantial evidence and is conclusive." *Id.* This Court likewise finds that the ALJ's determination that 1,645 jobs is a significant number is supported by substantial evidence.

This is a very close case. However, the Court believes that there is substantial evidence to support all findings of the ALJ and that he committed no reversible error. Accordingly, it is respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 14] be DENIED, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 18] be GRANTED.[1]

Respectfully submitted,

s/ Dennis H. Inman
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).